Edwin J. Jacobs, Jr., Esquire (NJ Attorney ID # 271401971)
Michael F. Myers, Esquire (NJ Attorney ID # 037312010)
JACOBS & BARBONE, P.A.
A Professional Corporation
Attorneys at Law
1125 pacific Avenue
Atlantic City, New Jersey 08401
(609) 348-1125
jacobsbabone@comcast.net
Attorneys for Defendants Joseph Wolfson, Betty Simon, Trustee LLC and Richard Simon, Trustee

| | |
|---|---|
| UNITED STATES OF AMERICA, | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY |
| v. | Criminal No. 2:13-cr-748-SDW (D.N.J.) |
| JOSEPH WOLFSON, GREGG GEHRING, JAMES JEFFERS, JR., ROBERT JEFFREY, BETTY SIMON TRUSTEE LLC; and RICHARD SIMON TRUSTEE   Defendants. | Criminal Action<br><br>**BRIEF IN OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE*** |

The above-captioned matter involves an alleged eleven (11) year conspiracy beginning in 1998 to violate the Sherman Antitrust Act at municipal tax lien auctions throughout the entire state of New Jersey. The government's investigation has spawned three (3) million pages of encrypted discovery and thirty (30) hours of audio surveillance. Jury selection is scheduled to begin on September 10, 2015 in the District Court of New Jersey-Newark before the Honorable Susan D. Wigenton.

On July 27, 2015, the government filed a Motion *In Limine* to "preclude Defendant's from presenting evidence or argument relating to tax collector awareness or acquiescence at trial." Defendants Joseph Wolfson, Richard Simon Trustee, and

1

Betty Simon Trustee, LLC (hereinafter "the Wolfson Defendants") submit this Brief in response.

## PROCEDURAL AND FACTUAL HISTORY

A.  <u>Municipal Tax Liens</u>

New Jersey has 567 municipalities. Property owners residing and/or operating in these municipalities pay property taxes, water taxes, and sewer taxes to fund local government services. The ability of a municipality to provide these services hinges on the collection of these taxes. For this reason, the failure of a property owner to pay these taxes is a serious detriment to all residents of a given municipality.

Municipal tax liens exist to generate funds owed to municipalities by real estate holders who do not pay property, water, and sewer taxes. When a property owner fails to pay these taxes, the municipality may encumber the owner's property in the amount of the unpaid taxes. This encumbrance is a secured lien on real estate known as a tax lien. <u>N.J.S.A</u>. 54:5-9.

If these taxes remain delinquent, the lien may be sold at a public auction held at least once a year within the municipality. These auctions are often referred to as municipal tax sales. The purpose of a municipal tax sale is to raise revenue for the municipality by funding these delinquencies. Notice of each tax lien auctions is widely published before the date of the sale by the municipality.

At these auctions, investors do not bid on the purchase price of the tax lien (i.e. the amount in unpaid taxes). Instead, each lien is auctioned off at a particular interest rate that will accrue on the purchase price of the lien. Pursuant to <u>N.J.S.A</u>. 54:5-32, "the sale is made in fee to such person as will purchase the property, subject to redemption

2

at the lowest rate of interest, but in no case in excess of eighteen (18) percent per annum." If a particular lien is highly sought after, it may be bid downward to an interest rate below eighteen (18) percent, including 0% after which "premium" bids may be made by investors. A premium bid is simply a bid to pay more than the total amount of the unpaid taxes on the property. Municipal tax collectors typically accept premium bids in one hundred dollar increments.

When an investor becomes the owner of a tax lien, he is imbued with a number of statutory entitlements. First, he receives interest. Second, he has the right to pay any subsequent taxes, water, sewer, and any other municipal charges that go unpaid on this property and collect interest at eight (8) percent if the total value of the tax sale certificate is under $1500.00 and eighteen (18) percent once the total value of the total tax sale certificate exceeds $1500.00. In the event the lienholder does not pay subsequent charges, he may go to the tax sale the following year and bid the same property by stating "Prior" at the auction. Third, the investor has the ability to foreclose on the property owner's right of redemption after two (2) years have passed. While municipal tax liens have "priority" over all other encumbrances, such foreclosures are uncommon as the redemption rate is consistently around ninety-five (95) percent.

If no investor bids on a tax lien, it is sold back to the municipality at an interest rate of eighteen (18) percent. This result is devastating to the municipality who now must now either engage in the lengthy and expensive task of foreclosing on the property, thereby becoming an owner of failed real estate, or assigning the lien. Assigning the lien can be difficult because an unbid lien is now stigmatized as an unattractive investment with few investors wishing to take the risk even with the added

incentive of a six (6) month redemption period instead of the usual two (2) years. Vacant land, including but not limited to wetlands and environmentally polluted properties, is frequently sold back to the municipality at an interest rate of eighteen (18) percent.

Aside from the initial interest rate, valuable liens often fall into one of two categories. The first category is occupied by liens attached to real estate that are valuable to own through foreclosure. For example, if a vacant property is located next to State owned land, there is a chance that the State eventually might wish to purchase it. This is often the case with wetlands. However, the downside is that the lienholder must wait two (2) years before foreclosure and the foreclosure process itself may take anywhere from fifteen (15) months to two (2) years.

The second category is made up of liens with subsequent taxes paid by the investor which generate a rate of return. For instance, if an investor purchases a $5,000.00 lien at 0% with a $1000.00 premium but the next year's unpaid taxes amount to $10,000.00, that investor will earn a 0% return on his or her initial $5,000.00 and $1000.00 premium, but would earn eighteen (18) percent interest on the subsequent taxes that he or she would pay. Therefore, the average rate of return goes up even if the initial purchase is made at premium.

    B.    <u>Defendants Joseph Wolfson, Richard Simon Trustee and Betty Simon Trustee, LLC</u>.

Richard Simon Trustee and Betty Simon Trustee, LLC both have their origins in J&M Land Company, a corporation founded by Richard Simon, a Holocaust survivor who immigrated to the United States in 1948. While living in Pleasantville, New Jersey, Richard found work as a chicken farmer, eventually purchasing municipal tax liens to make a better life for him and his family.

4

Betty Simon Trustee, LLC began as a Trust formed by Richard Simon in March of 1970. It is now a closely held Limited Liability Corporation doing business in Northfield, New Jersey. Richard Simon Trustee, formed twenty years later, is a Partnership doing business from the same location. Both entities purchased municipal tax liens throughout the 1998 to 2009 time period identified in the government's Indictment. Richard's son-in-law, Joseph Wolfson, a former law enforcement officer residing in Margate, New Jersey, was the primary bidder for the entities during this time frame.

C. The Indictment

On November 19, 2013, the Grand Jury sitting in Newark, New Jersey indicted defendants James Jeffers, Jr., Robert Jeffrey, Gregg Gehring, Joseph Wolfson, Betty Simon Trustee LLC (hereinafter referred to as "BST"), and Richard Simon Trustee (hereinafter referred to as "RST") on a single count of conspiracy to violate 15 U.S.C. §1[1] (The Sherman Antitrust Act) [Doc No. 1].

According to the government, beginning in 1998 and lasting until as late as February of 2009, there existed a single state-wide conspiracy to violate the Sherman Antitrust Act at four hundred and twenty-nine (429) New Jersey municipal tax lien auctions by suppressing and eliminating competition through the allocation and submission of non-competitive bids for the purchase of tax liens. Specifically, it is

---

[1] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court." 15 U.S.C. 1.

5

alleged that prior to the commencement of these auctions, the defendants (and many others) would discuss their lien preferences and agree not to bid against one another to increase the chances that they would obtain liens at interest rates of eighteen (18) percent. Joseph Wolfson, allegedly acting on behalf of BST and RST, was present at approximately 32 of these 429 auctions.

Pursuant to Court Orders signed by both the Honorable Faith Hochberg and the Honorable Michael Hammer, the government is limited to presenting documentary and/or testimonial evidence in regard to thirty (30) auctions (although Judge Hochberg recommended the government limit itself to five (5) to ten (10) auctions). Joseph Wolfson was present at fourteen (14) of these auctions. Only four (4) of these thirty (30) auctions are among the twenty (20) attended by undercover FBI agents. The 30 auctions are as follows:

1. Absecon City: June 6, 2008
2. Belleville: December 7, 2006
3. Blairstown: July 1, 2008
4. Brigantine City: March 14, 2006
5. Egg Harbor City: December 16, 2008
6. Egg Harbor Township: December 19, 2007
7. Egg Harbor Township: December 20, 2006
8. Franklin Township: December 28, 2004
9. Galloway: December 22, 2008
10. Glen Ridge: July 23, 2008
11. Hammonton: December 27, 2004
12. Kingwood: July 11, 2007
13. Long Branch: September 11, 2007
14. Lyndhurst: June 20, 2007 & June 26, 2007
15. Margate City: December 5, 2008
16. Metuchen: June 1, 2006
17. Mount Laurel: April 1, 2005
18. Mount Olive: October 17, 2007
19. North Wildwood: December 19, 2008
20. Pennsauken: 1998
21. Ridgefield Borough: June 5, 2008

       22. <u>Ridgefield Park</u>: October 29, 2007
       23. <u>Somers Point</u>: December 4, 2008
       24. <u>Upper Township</u>: December 2, 2008
       25. <u>Ventnor City</u>: December 7, 2007
       26. <u>Ventnor City</u>: December 5, 2008
       27. <u>Weehawken</u>: June 30, 2003
       28. <u>West Cape May</u>: December 3, 2008
       29. <u>Wildwood City</u>: December 14, 2005
       30. <u>Wildwood City</u>: December 16, 2004

    D.    <u>The Government's *In Limine* Motion</u>

On July 27, 2015, the government filed a Motion *In Limine* to "preclude Defendants from introducing documentary or testimonial evidence of, or otherwise arguing, that any of the tax collectors who conducted municipal tax lien actions were aware of, or acquiesced in the alleged conspiracy." The government argues that such evidence or argument is not relevant as to whether a conspiracy was knowingly formed and defendants knowingly joined it. The impetus for the government's Motion is its discovery that most, if not all, of its witnesses were unaware that pre-sale bidding agreements were illegal and that virtually none of tax collectors at the 429 allegedly rigged auctions ever told these witnesses otherwise. The government argues that the collusive behavior described in its Indictment constitutes bid rigging, a form of price fixing that is *per se* unreasonable. In response, defendants argue that (1) the government's motion is premature because whether an offense is *per se* unreasonable is a question for the trier of fact; and that (2) evidence of tax collector knowledge is relevant to the issue of intent, specifically as to whether the conspiracy was knowingly formed and whether defendants joined it.

**LEGAL ARGUMENT**

POINT I

THE EXISTENCE OF A *PER SE* CONSPIRACY TO VIOLATE THE SHERMAN ANTITRUST ACT IS A QUESTION FOR THE JURY. THE GOVERNMENT'S MOTION IS PREMATURE BECAUSE THE GOVERNMENT HAS NOT YET PROVEN A *PER SE* CONSPIRACY TO VIOLATE THE SHERMAN ANTITRUST ACT.

To prove a criminal violation of the Sherman Antitrust Act, the government must establish each of the following elements beyond a reasonable doubt:

> (1) an agreement to a joint action such as a conspiracy formed by two or more entities;
>
> (2) that the defendant knowingly joined this conspiracy;
>
> (3) the agreement unreasonably restrained trade or commerce; and
>
> (4) that the conspiracy concerned goods or services in interstate commerce.

Shaw v. United States, 371 F.Supp.2d 265, 272 (E.D.N.Y. 2005).

In addition, the first element is comprised of three (3) sub-parts, requiring that the government prove beyond a reasonable doubt that:

> (a) there existed a conspiracy as charged in the indictment;
>
> (b) the conspiracy was knowingly formed; and
>
> (c) the defendants knowingly participated in the conspiracy.

United States v. Continental Group, Inc., 456 F.Supp. 704, 715 (E.D.P.A. 1978) ( citing United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226-227, 59 S.Ct. 467, 83

8

L.Ed. 610 (1939); and United States v. Patten, 226 U.S. 525, 543, 33 S.Ct. 141, 57 L.Ed. 333 (1913).

Certain types of antitrust violations, such as price fixing, are sometimes considered unlawful *per se* under the Sherman Antitrust Act.[2] In other words, such a restraint of trade or commerce, if proven beyond a reasonable doubt, is *presumed* to be unreasonable. The *per se* rule, however, is triggered by the trier of fact.

> [.]..the district court must explain clearly what the jury has to find in order to trigger the per se rule: "in such a case, it must be explained to the jury that its function is to decide whether certain conduct, described with precision in the instruction, did or did not occur".

United States v. Alston, 974 F.2d 1206, 1214 (9th Cir. 1992).

"It is unclear whether an agreement to reduce competitive bidding in private business activities is sufficient to be categorized as price fixing and thus *per se* illegal." Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 891-892 (8th Cir. 1978). The operative criterion is the nature of the offense itself. The *per se* rule is applied to price fixing due to its "actual or potential threat to central nervous system of the economy". United States v. Socony-Vaccum Oil Co., 310 U.S. 811, note 59. More specifically:

---

[2] While price fixing is generally considered to be *per se* unreasonable, there are exceptions to this rule. Instances of price fixing that are "sufficiently novel or unusual" may "escape scrutiny under the *per se* rule". United States v. Alston, 974 F.2d 1206, 1214 (9th Cir. 1992). The United States Supreme Court has held that "it is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." Integrated Systems and Power Inc. v. Honeywell Intern, Inc., 713 F.Supp.2d 286, 290 (S.D.N.Y. 2010) (quoting United States v. Topco Assocs., Inc. 405 U.S. 596, 607-08 (1972)).

> The reasonableness of prices has no constancy due to the dynamic quality of the business facts underlying price structures. Those who fixed reasonable prices today would perpetuate unreasonable prices tomorrow, since those prices would not be subject to continuous administrative supervision and readjustment in light of changed conditions. Those who controlled the prices would control or effectively dominate the market. And those who were in that strategic position would have it in their power to destroy or drastically impair the competitive system.

Id. at 221.

Certain forms of bid rigging are considered a form of price fixing, but not all. A fact sensitive analysis is required. In Love v. Basque Cartel, 873 F.Supp. 563, 577-578 (District Court of Wyoming 1995), an exception to liability was carved out for auctions in which sellers permitted bidder behavior that would otherwise violate the Sherman Antitrust Act.

> It is undisputed that the sellers purposely structured the auction to encourage combination bidding, and actively encouraged joint bidding as the auction progressed. This leads the Court to the inescapable conclusion that although joint bidding removed potential individual bidders from the sale, the sellers considered such bidding to be an important, if not essential, factor in their success in achieving their minimum posted bids. The Court is in firm agreement with the long-established doctrine that sellers of property at auction—within certain limits not at issue here—are free to set the terms of the auction as they see fit.

Love v. Basque Cartel, 873 F.Supp. 563, 577-578 (District Court of Wyoming 1995).

Here, the government has not alleged a conspiracy to "fix prices". Accordingly, defense counsel will argue at trial that the *per se* rule does not apply to the antitrust allegations contained within the government's Indictment. Regardless, this is a matter

10

for the trier of fact. As such, the government's Motion is premature and should be denied.

## POINT II

EVIDENCE OF TAX COLLECTOR KNOWLEDGE IS RELEVANT TO WHETHER A CONSPIRACY WAS KNOWINGLY FORMED AND WHETHER DEFENDANTS JOINED IT.

"A defendant's state of mind or intent is an element of a criminal antitrust offense." United States v. United States Gypsum Co., 438 U.S. 422, 423 (1978)[3]; United States v. Alston, 974 F.2d 1206, 1213 (9th Cir. 1992) ("mere acquiescence" is not enough to make one liable for a Sherman Act conspiracy"; United States v. Koppers Co., Inc., 652 F.2d 290, 298 (2nd Cir. 1981) (the government must show that the defendant "intentionally" participated in an antitrust conspiracy).

Here, evidence of tax collector knowledge is relevant to the issue of whether a conspiracy was knowingly formed and whether it was joined by the defendants. Specifically, defense counsel will argue that the alleged "conspirators" operated in full view of the tax collectors because they did not believe their behavior was unlawful and that the tax collectors did not take steps to stop the alleged behavior because they shared the same view. Further, there was no single overarching conspiracy. Instead,

---

[3] "The 1955 Report of the Attorney General's National Committee to Study the Antitrust Laws concluded that the criminal provisions of the Act should be reserved for those circumstances where the law was relatively clear and the conduct egregious: "The Sherman Act, inevitably perhaps, is couched in language broad and general. Modern business patterns moreover are so complex that market effects of proposed conduct are only imprecisely predictable. Thus, it may be difficult for today's businessman to tell in advance whether projected actions will run afoul of the Sherman Act's criminal strictures. With this hazard in mind, we believe that criminal process should be used only where the law is clear and the facts reveal a flagrant offense and plain intent unreasonably to restrain trade." Report of the Attorney General's National committee to Study the Antitrust Laws 349 (1955)." United States v. United States Gypsum Co., 438 U.S. 422, 439 (1978).

there were many loose groups of small, independent bidders engaging in different practices and customs to compete in an industry that was becoming increasingly monopolized by certain larger institutional bidders.

## **CONCLUSION**

Defendants respectfully request that the government's Motion be denied.

Respectfully submitted,

JACOBS & BARBONE, P.A.

/s/ Edwin J. Jacobs, Jr.
Edwin J. Jacobs, Jr., Esquire
Michael F. Myers, Esquire

Dated: August 17, 2015

cc: All counsel
cc: Joseph Wolfson