UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA        :      Hon. Susan D. Wigenton
                            U.S. District Judge
        v.                   :

JAMES JEFFERS JR.

                             Criminal No. 13-748

            Defendant.        :

---

## GOVERNMENT'S OPPOSITION TO DEFENDANT JEFFERS' POST-VERDICT MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL

---

JEFFREY D. MARTINO
Chief, New York Office
Antitrust Division, Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 335-8000

STEVEN TUGANDER
BRYAN BUGHMAN
STEPHANIE RANEY
GRACE PYUN
Trial Attorneys

## INTRODUCTION

The Government submits this memorandum of law in opposition to Defendant Jeffers'

post-verdict motion for judgment of acquittal and motion for new trial under Rules 29 and Rule

33 of the Federal Rules of Criminal Procedure.  The Defendant seeks an order for a judgment of

acquittal and a new trial on the grounds that the evidence admitted at trial was insufficient to

sustain the conviction and that the Court made incorrect rulings both before and during trial.  For

the reasons stated below, the Defendant's motion should be denied in its entirety.

## RELEVANT BACKGROUND

Defendant Jeffers was indicted on November 19, 2013 for conspiring to allocate and rig

bids in violation of Section 1 of the Sherman Act.  The Indictment charged the Defendants James

Jeffers Jr., Gregg Gehring, Robert Jeffrey, Joseph Wolfson, Betty Simon, Trustee LLC and

Richard Simon Trustee with one count of violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

Specifically, the Defendants were charged with participating in a conspiracy to restrain trade and

competition by allocating and rigging bids at municipal tax lien auctions throughout the State of

New Jersey from at least as early as 1998 until approximately February 2009.

Pursuant to the order by the Court, the parties filed pre-trial motions on July 27, 2015.

Among those motions, Defendant Gehring moved to dismiss the Indictment, arguing that the

conduct alleged in the Indictment did not fall within the scope of Section 1 of the Sherman Act. [1]

(ECF No. 117).  Specifically, Defendant Gehring argued that the charged conduct did not

constitute "trade or commerce" and that municipal tax liens are not "goods or services" under the

language of the statute.  The Government also filed a motion *in limine* to exclude certain

evidence of tax collector acquiescence or awareness of the alleged conspiracy on the grounds

that it was irrelevant and potentially misleading to the jury.  (ECF No. 116).

---

[1] The other defendants, including Defendant Jeffers, joined in the motion.

The Court addressed these motions at the September 3, 2015 pre-trial conference and held further arguments on the motions.  In a September 15, 2015 Order memorializing the Court's ruling, the Court (1) denied Defendant Gehring's motion to dismiss the indictment for failure to allege an offense under the Sherman Act and (2) granted the Government's motion *in limine* to exclude certain evidence of tax collector acquiescence.  (ECF No. 147).

Jury selection began on September 10, 2015 and the trial commenced September 16, 2015.  Between September 16 and 28, the Government called nine witnesses to testify in its case-in-chief.  Included among those witnesses were the Defendant's co-conspirators and former supervisor.  Also among the witnesses was an FBI special agent through whom two video and two audio recordings were admitted, all four of which inculpated Defendant Jeffers.  In addition to the testimony and the recordings, the Government offered, and the Court admitted, twenty-five exhibits into evidence.

The jury deliberated between October 1 and 3, 2015 and returned a verdict of guilty against Defendant Jeffers.  The remaining four defendants were acquitted.

## ARGUMENT

Defendant Jeffers moves for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure on the basis that the evidence at trial failed to prove the elements of a Sherman Act offense as alleged in the Indictment, including the interstate commerce element.  The Defendant also requests a new trial under Rule 33 of the Federal Rules of Criminal Procedure on the basis of erroneous pre-trial rulings and jury charges, as well as a statement made in the Government's closing argument.  The Defendant's motion should be denied in its entirety because the evidence admitted at trial clearly proved that Defendant Jeffers knowingly participated in a conspiracy to rig and allocate bids that occurred in the flow of, and/or substantially affected, interstate commerce in violation of Section 1 of the Sherman Act, 15

3

U.S.C. § 1.  Furthermore, the Court's rulings on the parties' pre-trial motions and jury charges were proper and in light of evidence produced at trial, a new trial is not warranted in the interests of justice.

## I.      Review Standard for Rule 29

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "[a]fter the government closes its evidence or after the close of all evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[2]  The burden on a defendant who raises a challenge to the sufficiency of the evidence is "extremely high." *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008) (internal quotation marks omitted); *accord United States v. Hodge*, 321 F.3d 429, 439 (3d Cir. 2003) ("Our review of the sufficiency of the evidence after a guilty verdict is 'highly deferential.' " (quoting *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001)).

In reviewing a Rule 29 post-verdict motion for judgment of acquittal, the district court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001).  The court is required to "draw all reasonable inferences in favor of the jury's verdict." *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996).  Further, in conducting the sufficiency inquiry, the district court "[does] not view the government's evidence in isolation, but rather, in conjunction and as a whole. *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005); *see also United States v. United States Gypsum Co.*, 600 F.2d 414, 417 (3d Cir. 1979) (" '[T]he character and effect of a conspiracy (is) not to be judged by dismembering it and viewing its separate parts, but only by

---

[2] Fed. R. Crim. P. 29(b) allows the Court to reserve decision on the motion, let the trial proceed, submit the case to the jury and decide the motion after the jury returns a verdict of guilty.

4

looking at it as a whole.' ") (quoting *United States v. Patten*, 226 U.S. 525 (1913)) (parenthesis in the original).  "To sustain a conspiracy conviction, the 'contention that the evidence also permits a less sinister conclusion is immaterial . . . [T]he evidence need not be inconsistent with every conclusion save that of guilt.' " *United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002) (quoting *United States v. Dent*, 149 F.3d 180, 188 (3d Cir. 1998)).  Thus, a finding of insufficiency should "be confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984); *see also Smith*, 294 F.3d at 476–77.

**II.**     **The Defendant's Rule 29 Motion Should Be Denied.**

**A.  The Government's Proof at Trial was More Than Sufficient to Convict Defendant Jeffers of the Charged Sherman Act Offense.**

The Defendant's Rule 29 motion also asserts that the Government did not present sufficient evidence of a conspiracy to commit a Sherman Act offense in violation of 15 U.S.C. § 1.  "A conviction against any defendant is warranted if the jury finds beyond a reasonable doubt that the conspiracy alleged in the indictment existed and that the defendant knowingly became a member of the conspiracy. . . ."  *United States v. Am. Radiator and Std. Sanitary Corp.*, 433 F.2d 174, 182 (3d Cir. 1970).  The Government provided ample evidence to prove these elements.

Defendant Jeffers insists there was no conspiracy and that he did not knowingly participate in any conspiracy because "it was a job" that he was "taught to do." (ECF No. 195, p. 5).  But it is no defense to a conspiracy charge that everyone was doing it. *See, e.g., United States v. Gillen*, 599 F.2d 541, 550 (3d Cir. 1979).  The witness testimony, the documents, and the audio/video recordings produced at trial amply proved that Defendant Jeffers knowingly participated in a conspiracy to allocate and rig bids in violation of the Sherman Act as the properly-instructed jury found.  (Jury Charge No. 23–24).

Seven witnesses all testified at length to the existence of the conspiracy, that Defendant Jeffers—who bid for Crusader, one of the largest bidders—knowingly joined the conspiracy, that Defendant Jeffers played a key role in facilitating the allocation of liens and picking the "best" ones, and that the conspiracy affected interstate commerce. Several admitted exhibits—bid books, notes, and letters from co-conspirators—corroborated that testimony. Six co-conspirator witnesses: David Farber, Steven Hruby, Robert Stein, David Hasson, David Jelley, and William Collins, consistently testified that they allocated liens and rigged bids with Defendant Jeffers. Furthermore, the Government provided the testimony of an FBI Special Agent who served undercover and recorded Defendant Jeffers participating in the conspiracy.

### 1. David Farber

Farber, who bid for CCTS, testified that he attended auctions where he rigged bids and allocated liens with Defendant Jeffers between 2005 and 2008, specifically in the municipalities of Absecon, Galloway, Egg Harbor Township, and Cherry Hill, New Jersey. (Trial Tr. Sept 18, 2015 p. 36). He further testified that Defendant Jeffers would take an active facilitator role, and would "ask [other conspirators] what liens they wanted, and if they were willing to work out the sale in advance." *Id.* at 41. Farber also testified that there was "no way" he would bid against Jeffers on a pre-picked lien at Ventnor City because "it was [Jeffers'] pick." *Id.* at 43.

### 2. Steven Hruby

Hruby, who bid for M.D. Sass (Crusader's main competitor), testified that he flipped coins with Defendant Jeffers for liens that he was interested in purchasing, prior to the sale, for the purpose of rigging bids and allocating liens. Defendant Jeffers did not bid against Hruby in those instances because "[they] had an agreement." (Trial Tr. Sept 24, 2015 p. 76). He explained that the reason for allocating liens was for "less competition and [to] get a higher interest rate."

*Id.* at 82.  In the instances where Hruby sent other M.D. Sass bidders to auctions on his behalf, he testified that he would specify to his bidders that if Defendant Jeffers was there, "that they could work out the sale with him." *Id.* at 90.

   3. Robert Stein

   Stein, Defendant Jeffers' supervisor at Crusader, testified that he knew that Defendant Jeffers participated in the conspiracy because Defendant Jeffers "mentioned it to [him]."  (Trial Tr. Sept 25, 2015 p. 92).  Moreover, Stein testified that Defendant Jeffers had "worked out tax sales on his own without [Stein] having to tell [Jeffers] to do so." *Id.*

   4. David Hasson

   Hasson, who also bid for M.D. Sass, testified that he picked liens with Defendant Jeffers. *Id.* at 176. Hasson also testified that Defendant Jeffers would "save" liens for Defendant Wolfson, and would inform Hasson of the lien Defendant Wolfson had picked. "[Defendant Wolfson] would usually run late, and normally [Defendant Jeffers] would try to save a lien for him," *id.* at 177, and "in most cases, sales worked out with picked agreements." *Id.* at 178.

   5. David Jelley

   Jelley, who bid for Plymouth, Fidelity, and Edison, also testified that "if it was a sale where liens were being picked," Jelley would "honor" Jeffers' picks "all the time," and Jeffers would "honor" Jelley's picks "all the time."  (Trial Tr. Sept 28, 2015 p. 23).

   6. William Collins

   Finally, Collins, who bid for his own company, Independent Investors, testified  that he "definitely" picked liens with Jeffers, and that Jeffers would "pick first" and would "absolutely [...] pick the best liens."  (Trial Tr. Sept. 28, 2015 pp. 152–53).  He testified that he would pick cards with other smaller co-conspirators in order to allocate liens prior to the auctions.  After the

smaller bidders chose liens, Collins told Defendant Jeffers what the picks were "so that [Defendant Jeffers and the other large companies] wouldn't bid for the liens [the smaller bidders] had picked." *Id.* at 158.  Collins further testified that Defendant Jeffers would, at times, "save a lien" for Defendant Wolfson because "at times Joey would come in late and so that the sale could proceed without bidding against each other, [Jeffers] would pick out a lien for him." *Id.* at 160.

      7. <u>Special Agent Jessica Weisman</u>

      Special Agent Weisman testified to observing Defendant Jeffers rigging bids and allocating liens at six of the nine auctions she attended with him.  (Trial Tr. Sept 18, 2015 p. 215). She personally witnessed Defendant Jeffers writing down the picks in his bid book "many times," which was corroborated by the video and audio recordings admitted into evidence at trial. *Id.* at 210.   According to Special Agent Weisman's clear observations, Defendant Jeffers would "organize everyone else and figure out what everyone else was going to get." *Id.* at 215.  Based on this evidence, the Defendant was not simply a participant; Special Agent Weisman described him as a "bridge" between the top level bidders and the middle tier bidders. *Id.* at 206–207. According to Special Agent Weisman, "Jeffers was the conduit for telling us what they were taking." *Id.*  He was not only a "bridge" and a "conduit," but was also "a kind of mentor" to Special Agent Weisman, giving her pointers on how to get involved in the conspiracy. *Id.* at 208.

      Through Special Agent Weisman, the Government introduced two audio and two video recordings that showed Defendant Jeffers in the process of allocating tax liens with his competitors.  The audio and video recordings of the North Wildwood, Somers Point, Upper Township, and Ventnor City tax auctions, which were admitted as Government Exhibits 019O, 023G, 024I, and 025L, clearly implicated Defendant Jeffers by showing his active role in the

conspiracy. The tapes even showed, and Special Agent Weisman testified, that Defendant Jeffers warned her to be careful when rigging bids, because subpoenas had been issued in the course of past investigations into the industry. (Trial Tr. Sept 21, 2015 p. 55). For instance, at the auction in Somers Point, Defendant Jeffers was heard on tape saving a lien for Defendant Wolfson such that, as Mr. Collins later explained in his testimony, the sale would be rigged. *Id.* at 49. As shown on the recording at the auction in Upper Township, Defendant Jeffers entered the room and informed the group of the liens the larger companies had picked. *Id.* at 7. The recording then showed the group further dividing the liens among one another; at one point, Defendant Jeffers asked co-conspirator Michael Berman, "Want to grab another small one?", and then later remarks, " 'Put that down for Crusader and I'm done.'" *Id.* at 9–10. The recording even showed Defendant Jeffers joking about collusion. As Special Agent Weisman explains, "He was joking. It was a joke, that he didn't collude." *Id.* at 7. Finally, at the start of the auction and after Defendant Jeffers allocated liens among the group, Defendant Jeffers asked his co-conspirators, "Everybody is set?"

Thus, the testimony of Defendant Jeffers' co-conspirators and the Special Agent demonstrated Defendant Jeffers' active participation in the conspiracy. Each witness testified to the existence of a long-running conspiracy to rig bids and allocate liens, and several witnesses testified that Defendant Jeffers was an active participant who allocated liens and honored the pre-arranged picks of his co-conspirators. The evidence viewed in light most favorable to the Government establishes that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Accordingly, the Defendant's motion for judgment of acquittal on this ground must be denied.

**B.   The Evidence Admitted at Trial was Sufficient to Prove Interstate Commerce.**

Incorporating arguments previously made by his co-defendant, Defendant Jeffers claims the proof at trial was insufficient to satisfy the interstate commerce element of a Section 1 violation. (ECF No.195). His claim is without merit—premised on misreading the law and ignoring the facts.

To establish interstate commerce, the illegal conduct must constitute "either (1) activities that are in the flow of interstate commerce, or (2) activities which though occurring purely on a local level substantially affect interstate commerce." *Harold Friedman Inc. v. Thorofare Markets Inc.*, 587 F.2d 127, 132 (3d Cir. 1978); *Doctors, Inc. v. Blue Cross of Greater Philadelphia*, 490 F.2d 48, 50 (3d Cir. 1973). *See also Burke v. Ford*, 389 U.S. 320, 32 (1967). Although the Court properly conveyed this standard in its instructions to the jury, Defendant Jeffrey, in his Rule 29 motion, made the unsupported assertion that the Government's proof "lacked any detail." (ECF No. 164 at p. 2). But viewed in the light most favorable to the Government, the evidence provided at trial was more than sufficient to permit a rational trier of fact to conclude that the conspiracy was in or affected interstate commerce beyond a reasonable doubt. Defendant Jeffers' unsupported assertions that the Government did not meet its proof on this element fall far short of reaching the "extremely high" burden he must meet under Rule 29.

At trial, the Government proved that the conspiracy was imposed directly on goods or services that were within the flow of interstate commerce. As the Court instructed the jury, "the Government may prove that the conspiracy was imposed directly upon goods or services in the flow of interstate commerce. That is, commerce moving from one state to another." (Tr. Sept 30, 2015  p. 33: 17-19). Indeed, six of the nine testifying witnesses described several ways in which their own conspiratorial acts were in interstate commerce.

First, the conspiracy was in the flow of interstate commerce because a "significant portion of funds furnished for the purchasing" of the bid-rigged tax liens came from out-of-state funds. *Goldfarb. v. Va. State Bar*, 421 U.S. 773, 783 (1975). In *Goldfarb*, price fixing of lawyers' title examination services provided in Virginia satisfied the interstate commerce element of Section 1 because those local services were a necessary adjunct to interstate real estate transactions. 421 U.S. at 783-85. Those real estate transactions, though concerning sales of Virginia homes, were interstate because "a significant portion of funds furnished for the purchasing of homes in Fairfax County [in Virginia] comes from without the State of Virginia, and significant amounts of loans on Fairfax County real estate are guaranteed by the United States Veterans Administration and Department of Housing and Urban Development both headquartered in the District of Columbia." *Id.* at 783 (internal quotation marks omitted); *see also McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 241 (1980) (describing *Goldfarb* as concluding that "the activities of the attorneys [providing title examination services] were *within the stream of interstate commerce*"). Similarly, David Farber testified in this case that his company's bank account was located in Pennsylvania. *See* (Tr. Sept 18, 2015 p. 12:25, p. 13:1-6; p. 14: 6-11). The Government also introduced checks from both M.D. Sass and Crusader, totaling over $3.2 million, drawn on financial institutions located in Pennsylvania and New York, and used to purchase tax liens in New Jersey in furtherance of the conspiracy. (Trial Tr. Sept 28, 2015 p. 223); Government Exhibit 14. *See Goldfarb. v. Va. State Bar*, 421 U.S. 773, 783 (1975) (real estate sales were in interstate commerce because "a significant portion of funds furnished for the purchasing of homes in Fairfax County [in Virginia] comes from without the State of Virginia"). This evidence was straightforward proof of interstate commerce.

Substantial other evidence proved "the challenged conduct actually occurred in interstate commerce." *Carpet Group Int'l v. Oriental Rug Importers Ass'n*, 227 F.3d 62, 75 (3rd Cir. 2000), *abrogated on other grounds by Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011) (finding a group boycott by carpet wholesalers was in interstate commerce where, among other things, the defendant carpet wholesaler association was "headquartered in New Jersey"; several wholesaler defendants were "located in New York"; and defendants sent conspiracy-related communications to Rhode Island). Much like in *Carpet Group*, testimony here established that some of the largest companies in the industry, including Crusader, the company the Defendant bid for, were headquartered outside of New Jersey. Thus, Robert Stein testified about Crusader's headquarters in Pennsylvania, Steven Hruby and David Hasson testified about M.D. Sass's headquarters in New York, and David Jelley testified that he bid for a company based in Florida. *See* (Tr. Sept 24, 2015 p. 69: 1-25; p. 70:1-7); (Tr. Sept 25, 2015 p. 99:14-18); (Tr. Sept 25, 2015 p. 150: 8-25, p. 151:1); (Tr. Sept 28, 2015 p. 11: 9); Government exhibits 025D, 024C, and 023. Hruby also testified about M.D. Sass's "$200 million portfolio" which the company acquired by raising "money from outside institutions and wealthy investors, and then they used that money to buy tax liens and then with those tax liens, they leveraged, they borrowed money using those tax liens as collateral." (Tr. Sept 24, 2015 p. 70: 19-22). Moreover, corporate co-conspirators regularly sent documents to bidders across state lines, which the bidders used at the auctions they attended before sending these documents back across state lines. *See* (Tr. Sept 24, 2015 pp. 85, 86); (Tr. Sept 25, 2015 p. 33: 13-23); (Tr. Sept 28, 2015 p 14: 22-25; p. 15:1-10). Moreover, as in *J. P. Mascaro & Sons, Inc. v. William J. O'Hara, Inc.*, the conspiracy here involves "customers who pay from out-of-state." 565 F.2d 264, 268 (3d Cir. 1977).

For these reasons, it is immaterial that Defendant Jeffers claims that the "charged conduct concerned solely intrastate activity at the municipal level in New Jersey." (ECF No. 164 p. 12). As the Court correctly instructed the jury, the Government can meet its burden on interstate commerce "even though some or all of the activities may have been done wholly within one state." (Tr. Sept 30, 2015 p. 34:7-9); *see also McLain*, 444 U.S. at 241 (Sherman Act reaches wholly local conduct that affects interstate commerce); *id.* at 236 (local activities that are a "inseparable and integral part" of larger interstate transactions are in interstate commerce). This claim is also factually inaccurate. The record is clear: multiple corporate co-conspirators were headquartered outside of New Jersey and sent and received funds and bidding documents across state lines, and at least one individual co-conspirator traveled from out of state to attend auctions in New Jersey. The evidence, taken in its entirely, could easily permit a reasonable trier of fact to conclude that the Government proved interstate commerce beyond a reasonable doubt.

Relying on Defendant Gehring's pretrial motion to dismiss the indictment, Defendant Jeffers also argues the interstate commerce element was not satisfied because the charged conspiracy did not involve trade or commerce. *See* (ECF. No. 195). But the court properly rejected that argument when raised pretrial. *See* (ECF No. 147). "A 'tax lien' is merely a security established by statute of which the taxing authority may avail itself in the event of a default in payment." *United States v. Phillips*, 267 F.2d 374, 377 (5th Cir. 1959); *see also In re Bates*, 974 F.2d 1234, 1236 (10th Cir. 1992). Gehring's primary argument was that a tax lien is not a good or service because the "underlying activity of the auctions at issue – paying property taxes owed to a municipality . . . – is not a commercial transaction under the Sherman Act." (ECF. No. 117 p.5). This argument fails because it ignores that a lien is "distinct from the obligation which it secures." *Phillips*, 267 F.2d at 377. Moreover, it is well established that the

sale of securities is commerce for purposes of the constitution, *Oklahoma-Texas Trust* v. *SEC*, 100 F.2d 888, 890 (10th Cir. 1939), and that the Sherman Act was intended to reach the fullest extent of the commerce power, *see Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 329 n.10 (1991) (Congress "left no area of its constitutional power unoccupied."). *See also McLain*, 444 U.S. 232 (sales of property constitutes commerce under Sherman Act). Therefore, the Sherman Act reaches conspiracies, such as the charged tax-lien conspiracy here, to restrain trade in securities.

Jeffers further asserts, with no basis in the record, that the Government introduced no evidence on this question. *See* (ECF No. 195). He does point to Jury Note #1, (ECF. No. 176), which asked for a definition of "goods or services" under the Sherman Act, but that gets him nowhere. The court properly responded to this note: "The issue of whether municipal tax liens are goods and/or services is not for your consideration. Please consider all of the jury instructions." *See* (Tr. Oct. 1, 2015 p. 82). Those instructions already provided the relevant question—whether the defendants engaged in trade or commerce within meaning of the Sherman Act. *See* (Trial Tr. Sept 30, 2015, pp. 33, 34). On this question, the government provided ample evidence that the defendants restrained trade in the sale of tax liens, *see, e.g.*, pp. 9–13 above, which is commerce within the meaning of the Sherman Act, *see supra*.

## III.   <u>Review Standard for Rule 33</u>

Rule 33(a) provides that: "the court may vacate any judgment and grant a new trial if the interest of justice so requires." A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it "believes that 'there is a serious danger that a miscarriage of justice has occurred.' " *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003). When evaluating a Rule 33 motion, the district court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the

Government's case." *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (citing *States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)).  Motions for a new trial based on the weight of the evidence are not favored. *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987). Such motions are to be granted sparingly and only in exceptional cases. *Id.*

## IV.   <u>The Defendant's Request for a New Trial Under Rule 33 Should Be Denied.</u>

### A. Statements Made in Closing Argument Were Not Material to Defendant Jeffers' Conviction.

Next, pursuant to the Defendant's request for a new trial under Rule 33, Defendant Jeffers argues that the Government falsely stated during its summation that Defendant Jeffers taught Special Agent Weisman to pick liens.[3]  Defendant Jeffers further asserts that the Government's "falsehood was crucial to the conviction of Defendant."  (ECF No. 195, p. 3).

Nothing about the Government's summation was improper, let alone grounds for granting a new trial.  To the contrary, the prosecutor had a solid basis in the evidence to argue in summation that Defendant Jeffers taught Special Agent Weisman to pick liens.  First, the recordings captured Defendant Jeffers warning Special Agent Weisman at the Somers Point auction about being careful when she picked liens, advising her that subpoenas had been issued in the past and that state officials sometimes attended the auctions.  (Trial Tr. Sept. 21, 2015 p. 53).  Second, during the same auction, the recordings captured Defendant Jeffers advising Special Agent Weisman to go outdoors and participate while liens were being picked by conspirators who were picking cards. *Id.*  Third, the recordings captured Defendant Jeffers advising Special Agent Weisman as to the particular types of liens that she should pick and to act more aggressively during her lien picking discussions with other conspirators.  (Trial Tr. Sept. 21, 2015 p. 64).  Furthermore, Special Agent Weisman corroborated and expanded upon each of

---

[3] As the Court is aware, the Government's witnesses testified consistently that in connection with New Jersey tax lien auctions, the conspirators used the term "picking liens" to describe their bid rigging conduct.

these discussions with Defendant Jeffers during her direct examination.  (Trial Tr. Sept. 21, 2015 pp. 54–56; 65).

Although Defendant Jeffers has not identified the specific testimony wherein he claims that Special Agent Weisman "expressly denied" that Defendant Jeffers taught her to pick liens, the Government assumes that he means to refer to the following exchange that occurred on redirect examination:

Q:  Mr. Olejar asked you a series of questions about your mentoring relationship with Mr. Jeffers.  Do you recall that?

A:  Yes.

Q:  And was part of that mentoring relationship mentoring you on how to rig bids?

A:  On how to rig bids?

Q:  How to pick liens?

A:  I mean, not really.  I mean, he would tell me to, you know, go stand up for myself, if that's what you mean , with the other guys and just don't take sewer liens, you know, you need to stand up for yourself. Things like that.  He didn't sit down and tell me what lien to pick.

Q:  Okay.  But the standing up for yourself, that was in connection with the picking conversations, is that correct?

A:  Yes.

Q:  Okay.  And when he told you to go outside at Somers Point when there were cards being picked you recall that?

A:  Yes.

Q:  Is that part of what you would call the mentoring process?

A:  Definitely.

(Trial Tr. Sept. 22, 2015 pp. 133, 134).

Taken as a whole, the answers elicited above during Special Agent Weisman's redirect examination do not undercut the Government's argument in summation that in certain respects,

Defendant Jeffers taught Special Agent Weisman how to pick liens.  As quoted above, Special Agent Weisman testified on redirect that Defendant Jeffers advised her to act more aggressively during the lien picking process by telling her to "stand up" for herself and advising her: "just don't take sewer liens."  She also testified during the same exchange that when Defendant Jeffers told her to go outside while liens were being picked at the Somers Point auction, it was part of the process of his acting as a mentor to her.  And certainly, combined with the other evidence described above that was elicited from the recordings and during Special Agent Weisman's direct examination, the Government was on solid footing to argue in summation that Defendant Jeffers taught Special Agent Weisman to pick liens.  "A prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." *United States v. Lee*, 612 F.3d 170, 194 (3d Cir.2010) (quoting *United States v. Werme*, 939 F.2d 108, 117 (3d Cir.1991)).  Moreover, pursuant to the Court's proper instructions, the jury was free to disregard the Government's argument or conclude that the argument was not supported by the evidence.  As a result, there is no merit to Defendant's assertion that the Government's argument on this issue requires the verdict of conviction to be set aside.

In any event, even assuming there were an impropriety in the government's summation, it would provide no basis for a new trial in this case.  "Improper statements made during summation may warrant a new trial when such statements 'cause[] the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Brown*, 765 F.3d 278, 296 (3d Cir. 2014).  But here the Court protected against any risk of prejudice when it instructed the jurors on several occasions that statements made by counsel during summations were to be considered only as argument and not

as evidence. (Trial Tr. Sept. 30, 2015 p. 39); (Trial Tr. Oct. 1, 2015 pp. 7; 61). In addition, the Court properly instructed the jurors that if they perceived there to be any factual discrepancies between statements made by counsel during summations and their recollection, the jurors' recollection was to control. (Trial Tr. Oct. 1, 2015 pp. 7; 61). "Jurors are presumed to follow the instructions they are given." *United States v. Claxton*, 766 F.3d 280, 299 (3d Cir. 2014).

Moreover, whether Defendant Jeffers taught Special Agent Weisman to pick liens certainly was not a crucial factor in the Defendant's conviction. As described above, at pages 5–9, the Government introduced overwhelming evidence of Defendant Jeffers' participation in the charged conspiracy. Special Agent Weisman testified that she observed Defendant Jeffers rigging bids and allocating liens at six auctions, and that at most of these auctions, she rigged and allocated liens with Defendant Jeffers. Special Agent Weisman also provided specific and detailed evidence pertaining to three auctions in which Defendant Jeffers participated in rigging and allocating liens. In addition to the testimony of Special Agent Weisman, the evidence included the testimony of six witnesses, each of whom testified that they conspired to rig bids with Defendant Jeffers during the charged period. Each witness also testified that he conspired with Defendant Jeffers years before Special Agent Weisman began attending auctions. And, during the course of the trial, the Government also admitted into evidence and played for the jury, video and audio recordings of three rigged auctions. Each of the recordings indisputably captured Defendant Jeffers explicitly participating in the charged conspiracy. In addition to the testimony and recordings, the Government introduced a number of incriminating documents including bid books that were used by the conspirators to keep track of the liens that were rigged and allocated during the conspiracy. The bid books provided strong evidence of both the existence of the charged conspiracy, and Defendant Jeffers' participation in it. The

18

Government's proof in this category included the admission of Defendant Jeffers' own bid books, which he used to allocate and rig bids during the life of the conspiracy. Moreover, Defendant Jeffers does not even dispute that he rigged bids and allocated liens as charged in the Indictment. Instead he raises a number of irrelevant arguments and assertions, none of which constitute a valid defense.[4] As a result, there is no merit to the Defendant's argument that the issue of whether Defendant Jeffers taught Special Agent Weisman to pick liens was crucial to his conviction.

### B. The Court's Rulings on Pre-Trial Motions were Proper and Do Not Warrant a New Trial.

Additionally, Defendant Jeffers disputes the Court's rulings on certain pre-trial motions. He argues that the Court's denial of Defendant Gehring's motion to dismiss the indictment was improper but offers no basis as to why the Court ruled in error. The Court's pre-trial rulings are legal determinations that do not go to the weight of the evidence admitted at trial. The Court's denial of Defendant Gehring's motion was proper as it is supported by the case law and the facts as alleged in the Indictment. (Hr'g Tr. Sept. 3, 2015 pp. 21:6–16).

The Defendant also argues that the Court's grant of the Government's motion *in limine* to exclude evidence of the municipalities' knowledge or acquiescence of the conspiracy to allocate and rig bids at municipal tax lien auctions improperly deprived the Defendant of a defense under the state action doctrine. *See* (ECF Nos. 116 & 147). But the Defendants never raised this defense, and in any event the excluded evidence could not have provided a proper basis for raising it. The state action doctrine provides an antitrust defense for private parties if (1) the challenged restraint is contemplated by a clearly articulated and affirmatively expressed policy of

---

[4] These include assertions that: (1) the bid rigging and allocation conduct proved at trial was longstanding and pervasive, (2) Defendant Jeffers was taught by others to rig bids and (3) Special Agent Weisman was easily able to infiltrate the conspiracy. (ECF No. 195, p. 5).

the state legislature to displace competition and (2) the State actively supervises the challenged

anticompetitive conduct.  *See Southern Motor Carriers Rate Conf. Inc. v. United States*, 471 U.S.

48 (1985); *California Retail Liquor Dealers Assn. v. Midcal Aluminum Inc.*, 445 U.S. 97 (1980).

Even if the excluded evidence could have established active supervision by the state, which it

would not, no Defendant ever suggested that New Jersey has clearly expressed a policy

displacing competition.  On the contrary, New Jersey state law has prescribed competition—i.e.,

the sale of municipal tax liens through an auction system involving competitive bidding.  *See*

N.J.S.A. 54:5–1 to –104; *see also Caput Mortuum, L.L.C. v. S & S Crown Services, Ltd.*, 366

N.J. Super. 323, 334 (2005).  Because the Defendants thus had no basis to raise the state action

doctrine as a potential defense, the district court properly granted the Government's motion *in*

*limine* to exclude the evidence as irrelevant to the issues in the case.

### C.  The Court's Rulings on the Jury Instructions Were Proper and Do Not Warrant A New Trial.

The Defendant's arguments as to the Court's treatment of the jury instructions also fail to

show why acquittal or a new trial is warranted.  The Defendant first asserts, without any

explanation, that the Court erred in rejecting his proposed jury instructions related to the legality

of discussions before tax lien sales and New Jersey State public policy.  The Defendant's

proposed instructions included an instruction regarding New Jersey's public policy behind tax

liens explaining the purpose and the structure of tax lien auctions.  (Def. Wolfson Proposed Jury

Charge No. 2).  Another instruction proposed by the Defendant was a statement that the

municipality may determine the manner, conditions, and terms of the tax liens sale.  (Def.

Wolfson Proposed Jury Charge No. 3).  Such instructions are not relevant to any legal element

that would assist the jury in determining whether the Government proved beyond a reasonable

doubt all the elements of a Sherman Act conspiracy as alleged in the Indictment.  The Court thus

properly rejected the use of these instructions on the basis that they did not charge the jury on the law and that they would only serve to confuse the jury.  (Trial Tr. Sept. 29, 2015 pp. 59–61).

## **CONCLUSION**

Based on the forgoing reasons, the Government respectfully requests that the Court deny Defendant Jeffers' motion for a judgment of acquittal and new trial under Rules 29 and 33.

Respectfully Submitted,

Dated: November 6, 2015

/s/ Steven Tugander
STEVEN TUGANDER
BRYAN C. BUGHMAN
STEPHANIE RANEY
GRACE PYUN
Trial Attorneys
United States Department of Justice
Antitrust Division
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 335-8032